UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RODNEY S. PERRY, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-00846-JRS-TAB |
| | ) | |
| PAUL A. TALBOT, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT,
DISMISSING ACTION, AND DIRECTING ENTRY OF FINAL JUDGMENT**

On December 15, 2018, an ambulance rushed Rodney Perry from Pendleton Correctional

Facility (PCF) to an emergency room. Mr. Perry was gravely ill due to undiagnosed—and therefore

uncontrolled—diabetes.

In this lawsuit, Mr. Perry asserts that his prison doctor, Dr. Paul Talbot, violated his Eighth

Amendment rights by failing to recognize and treat his diabetes before December 2018 and by

failing to treat his diabetes symptoms effectively after he returned from the hospital. Because no

evidence indicates that Dr. Talbot was deliberately indifferent to Mr. Perry's serious medical needs

in either phase of his illness, Dr. Talbot is entitled to judgment as a matter of law.

## I. Summary Judgment Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). "Material facts are those that might affect the outcome of the suit under applicable

substantive law." *Dawson v. Brown,* 803 F.3d 829, 833 (7th Cir. 2015) (internal quotation omitted).

"A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-movant's favor. *See Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 628 (7th Cir. 2018). When a party moving for summary judgment asserts facts and supports them with admissible evidence, the Court treats those facts as admitted without controversy unless the non-movant specifically controverts them with admissible evidence, shows the movant's assertions are not supported by admissible evidence, or demonstrates that the factual record leaves a material factual dispute. S.D. Ind. L.R. 56-1(f)(1).

## II. Recognition and Treatment of Diabetes Before December 15, 2018

Mr. Perry was hospitalized due to undiagnosed, untreated diabetes in December 2018. He alleges that Dr. Talbot violated his constitutional rights by failing to recognize and treat his diabetes before the condition became so serious. However, no evidence would allow a reasonable jury to conclude that Dr. Talbot was deliberately indifferent to Mr. Perry's risk for diabetes.

**A.     Facts**

Mr. Perry has been in Indiana Department of Correction (IDOC) custody since 1997. He moved to PCF from the Indiana State Prison in June 2015. Dkt. 106-1 at 1. Dr. Talbot was the physician primarily responsible for Mr. Perry's medical care from his arrival at PCF until Dr. Talbot left PCF in November 2019.

Mr. Perry was diagnosed with hyperlipidemia—high cholesterol—in 2014. *Id.* at 278. Due to his high cholesterol, the medical staff placed Mr. Perry on a "chronic care" status. *Id.* Chronic care inmates have regularly scheduled appointments to address their chronic conditions. *Id.* at 259. These appointments occur at 30-, 60-, or 90-day intervals. *Id.*

On January 11, 2016, Mr. Perry was prescribed Lipitor to manage his cholesterol. *Id.* at 5. Mr. Perry had chronic care appointments with Dr. Talbot on April 30 and November 25, 2016. *Id.* at 4–5.

Mr. Perry had his blood drawn and analyzed shortly before a chronic care appointment with Dr. Talbot on May 24, 2017. *Id.* at 23–25. Dr. Talbot found Mr. Perry's cholesterol well controlled and continued his Lipitor prescription for another six months. *Id.* at 23–24.

Mr. Perry had a chronic care appointment with Wambui Murage—a nurse practitioner— on December 19, 2017. Dkt. 102-1 at 10–13. She directed changes to Mr. Perry's diet and called for another chronic care appointment in six months. *Id.* She also ordered blood work and suggested that, if his lipid levels were unremarkable, he should be removed from chronic care all together. *Id.* The bloodwork Nurse Murage ordered included an analysis of Mr. Perry's A1C hemoglobin levels. *Id.*

The medical staff attempted to draw Mr. Perry's blood on February 26, 2018, to perform those tests. Dkt. 106-1 at 164. However, Mr. Perry refused. *Id.*

Mr. Perry met Dr. Talbot for a chronic care appointment on June 19, 2018. Dkt. 102-1 at 29–32. Dr. Talbot found Mr. Perry's cholesterol to be well controlled and noted that he had not experienced any complications. *Id.* Specifically, Mr. Perry had not experienced episodes of hypoglycemia, or low blood sugar. *Id.* Dr. Talbot prescribed Lipitor and aspirin through December 15, 2018. *Id.* He also ordered bloodwork, including a comprehensive metabolic panel. *Id.* A comprehensive metabolic panel tests blood-sugar levels and therefore can be used to detect diabetes. *Id.* at 3.

Medical staff attempted again on July 30, 2018, to draw Mr. Perry's blood for the tests Dr. Talbot ordered. Dkt. 106-1 at 165. Mr. Perry again refused. *Id.*

Mr. Perry visited Dr. Talbot on October 30, 2018, regarding a rash. Dkt. 102-1 at 26–28. Dr. Talbot prescribed a topical cream to treat the rash. *Id.* Dr. Talbot's record of that visit does not indicate that they discussed Mr. Perry's cholesterol, but Dr. Talbot extended Mr. Perry's Lipitor and aspirin prescriptions through April 27, 2019. *Id.* No evidence indicates that Mr. Perry raised any health concerns beyond his rash during this visit.

Mr. Perry became gravely ill in mid-December 2018. For four or five days, he could not eat, he lost weight, and he "was panting like a dog." Dkt. 102-2 at 13. By the very early morning of December 15, Mr. Perry was vomiting blood. *Id.* An officer took him to the infirmary, and he lost consciousness. *Id.*

The nurse who received Mr. Perry at the infirmary noted that he was experiencing chest pains, that his tongue was dry, and that he was unsteady when he stood up. Dkt. 102-1 at 23–25. She contacted Dr. Talbot, and he directed her to provide fluids intravenously and to test a urine sample. *Id.* Based on the results of that test, Dr. Talbot ordered that Mr. Perry be transported to the hospital by ambulance. *Id.* at 4.

At the hospital, Mr. Perry was treated for diabetic ketoacidosis (DKA). Dkt. 102-1 at 18. DKA occurs when a person's blood-sugar levels remain too high for too long and his blood becomes too acidic. Dkt. 106-1 at 261. DKA can cause a person to fall into a coma or even die. *Id.* at 16, 261. Mr. Perry was diagnosed with diabetes, and he remained in the hospital for about five days. Dkt. 102-1 at 18.

**B.    The Eighth Amendment**

"To determine if the Eighth Amendment has been violated in the prison medical context," the Court must "perform a two-step analysis, first examining whether" the plaintiff "suffered from an objectively serious medical condition, and then determining whether" his medical care

providers were "deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

Dr. Talbot does not dispute that Mr. Perry's undiagnosed, untreated diabetes was a serious medical condition. Accordingly, the Court proceeds directly to the question of deliberate indifference.

"As its name implies, deliberate indifference requires 'more than negligence and approaches intentional wrongdoing.'" *Goodloe v. Sood*, 947 F.3d 1030 (7th Cir. 2020) (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). "Rather, the evidence must show that the prison official . . . knew or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." *Goodloe*, 947 F.3d at 1030. A medical professional commits textbook deliberate indifference when he or she:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

## C.    Analysis

Mr. Perry argues that Dr. Talbot should be liable for the serious illness he suffered in December 2018 for three reasons. First, Dr. Talbot failed to promptly diagnose Mr. Perry's diabetes sooner. Second, Mr. Perry was not seen by a doctor for several months in 2018. Third, Mr. Perry

did not receive cholesterol medication for an extended period in 2018, which allowed his condition to devolve into DKA.

No evidence supports any of these arguments. A reasonable jury could not conclude that Dr. Talbot was deliberately indifferent toward Mr. Perry's risk for diabetes, his need for attention from a physician, or his need for medication.

### 1.  Failure to Diagnose Diabetes

Mr. Perry asserts that Dr. Talbot should have been aware that he was at heightened risk for diabetes before he became ill in December 2018. According to Mr. Perry, Dr. Talbot remarked during one appointment that Mr. Perry's bloodwork showed that he was "borderline" diabetic. Dkt. 102-2 at 6–7. Mr. Perry further states that Dr. Talbot knew he had a family history of diabetes. *Id.*; dkt. 111-1. And, he asserts that Dr. Talbot should have been particularly alert to Mr. Perry's risk of diabetes because there is a correlation between diabetes and high cholesterol. Dkt. 106-1 at 12, 16, 279.

Assuming all these assertions are true, they do not show that Dr. Talbot was deliberately indifferent to Mr. Perry's risk of diabetes. Indeed, even construed in the light most favorable to Mr. Perry, the evidence shows otherwise.

At their last chronic care visit on June 19, 2018, Dr. Talbot noted that Mr. Perry did not display any of 31 complications of hyperlipidemia—including episodes of low blood sugar. Dkt. 102-1 at 29. Moreover, he ordered bloodwork, including a full metabolic panel, which would have revealed Mr. Perry's blood-sugar level and allowed him to diagnose diabetes. *Id.* at 3, 29–31. Mr. Perry does not contest the accuracy of these medical records or Dr. Talbot's affidavit testimony that the bloodwork he ordered on June 19 would have detected diabetes if it was present.

Mr. Perry's blood was never tested because he refused to have it drawn—not because of indifference by Dr. Talbot. Dkt. 106-1 at 165. Mr. Perry states that he refused to have his blood drawn because Dr. Talbot did not communicate beforehand that his blood would be drawn or for what purpose. Dkt. 102-2 at 11. This is not evidence of deliberate indifference. "[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible . . . ." *Arnett*, 658 F.3d at 754. "[A]n inmate is not entitled to a warm bedside manner." *Karraker v. Kankakee Cty. Sheriff's Dep't*, 65 F.3d 170, 1995 WL 508075, at *4 (7th Cir. 1995).

The undisputed evidence shows that Dr. Talbot did not disregard Mr. Perry's heightened risk for diabetes. To the contrary, that evidence shows that Dr. Talbot checked Mr. Perry for symptoms of diabetes and ordered tests that would have diagnosed it. He did not violate the Constitution by failing to discuss those diagnostic efforts more thoroughly with Mr. Perry.

### 2.  Time Between Appointments

Mr. Perry also argues that he was not seen by a doctor for several months in 2018 and that this caused his medical condition to devolve into DKA. However, the record shows that Dr. Talbot met with Mr. Perry for a chronic care appointment on June 19, 2018, found no complications of high cholesterol or evidence of diabetes, and ordered blood tests that would have revealed diabetes. Dkt. 102-1 at 2–3, 29–32. After Mr. Perry refused the blood tests, *see* dkt. 106-1 at 165, Dr. Talbot saw Mr. Perry on October 30 regarding a rash, dkt. 102-1 at 26–28. No evidence indicates that Mr. Perry reported any symptoms at that appointment that should have alerted Dr. Talbot to diabetes.

Mr. Perry presents no argument—much less evidence—stating what Dr. Talbot should have done differently. Dr. Talbot met with Mr. Perry in June and again in October, and Mr. Perry presented no evidence of diabetes either time. Mr. Perry did not request another medical

appointment before he became ill in mid-December. No evidence would allow a jury to find that Dr. Talbot caused Mr. Perry to fall into DKA by failing to meet with him more frequently in the summer or fall of 2018.

### 3.   Deprivation of Medication

Finally, Mr. Perry asserts that he went without medication for long periods before he fell into DKA in December 2018. Mr. Perry's medical records show that Dr. Talbot kept active prescriptions for his cholesterol medications from his June 2018 appointment until after Mr. Perry went to the hospital on December 15. Dkt. 102-1 at 28, 31. Mr. Perry does not dispute Dr. Talbot's testimony that other members of the prison staff were responsible for distributing medications to inmates. Dkt. 102-1 at 3. Mr. Perry also does not present any evidence—such as a healthcare request form—that should have alerted Dr. Talbot to the fact that he was not receiving medication.[1]

### 4.   Conclusion

In sum, no evidence would allow a jury to reasonably conclude that Dr. Talbot knew or should have known Mr. Perry was suffering from diabetes or at serious risk of falling into DKA until Mr. Perry presented with symptoms of DKA on December 15, 2018. Likewise, no evidence would allow a jury to reasonably conclude that any act or omission by Dr. Talbot worsened Mr. Perry's condition and caused him to fall into DKA. Dr. Talbot is entitled to summary judgment on any claim that he was deliberately indifferent to Mr. Perry's serious medical needs before December 15, 2018.

---

[1] To the extent Mr. Perry argues that he was without his mental health medications, it is less clear that he had them continuously throughout the summer and fall of 2018. Nevertheless, Mr. Perry had an active prescription for Cymbalta from October 9, 2018, until after he returned from the hospital. Dkt. 102-1. Mr. Perry points to no evidence that would have indicated to Dr. Talbot that Mr. Perry was not receiving this medication. And, significantly, Mr. Perry stated in his deposition that he did not take mental health medications that were prescribed for him from 2014 forward. Dkt. 102-2 at 12.

### III. Treatment of Diabetes Symptoms After December 19, 2018

Mr. Perry also asserts that Dr. Talbot was deliberately indifferent to the symptoms of diabetes Mr. Perry experienced after returning from the hospital in December 2018. Again, no evidence would allow a reasonable jury to find for Mr. Perry.

**A.     Facts**

Mr. Perry returned from the hospital to PCF on December 19, 2018. Dkt. 102-1 at 18. Dr. Talbot met with him the following day. *Id.* Dr. Talbot placed Mr. Perry on a daily insulin regimen and ordered that he be provided with a diet for diabetic inmates, which included an evening snack. *Id.* at 18–21. Mr. Perry's pre-hospitalization prescriptions remained active; these included Lipitor and aspirin for his cholesterol, Cymbalta for his mental health conditions, a laxative, and a stool softener. *Id.* at 21. Because Mr. Perry reported blurred vision, Dr. Talbot ordered that he be scheduled for an appointment with the prison's optometrist. *Id.* at 18. After this appointment, Mr. Perry also received a prescription for Metformin to regulate his blood sugar. *Id.* at 74.

The following week, Mr. Perry submitted a flurry of healthcare requests. On December 24, Mr. Perry complained of impaired vision and asked to be examined by an eye doctor. Dkt. 106-1 at 338. He was scheduled for an appointment at the eye clinic the following day. *Id.* On December 25, Mr. Perry complained of pain in his feet and requested to be examined by a foot specialist. *Id.* at 339. On December 26, Mr. Perry complained of excruciating back pain and requested to be examined by a back specialist. *Id.* at 247. And, on December 27, Mr. Perry complained that his skin was dry and asked for lotion. *Id.* at 344.

Dr. Talbot addressed Mr. Perry's complaints of back pain, foot pain, and visual impairment during a visit on December 29. Dkt. 102-1 at 14–17. It does not appear that Dr. Talbot addressed

Mr. Perry's dry skin during this appointment. Dr. Talbot adjusted Mr. Perry's insulin dosage and confirmed that the optometrist had been notified of Mr. Perry's need for an appointment. *Id.* at 14. Dr. Talbot noted that Mr. Perry had an active prescription from his psychiatrist for Cymbalta and added a prescription for Pamelor. *Id.* Both are antidepressant medications that are also used to treat nerve pain.

On January 5, 2019, Mr. Perry submitted a healthcare request stating that his medications were not relieving his back and foot pain.  Dkt. 106-1 at 248. He added that the Pamelor was causing him "bad side effects." *Id.* He asked to be prescribed Neurontin instead of Pamelor. *Id.*

In fact, Mr. Perry was not experiencing any side effects from Pamelor or Cymbalta. Although he was prescribed both drugs, he never consumed either as directed by his doctors:

| | |
|---|---|
| Q | And did he prescribe you medication for nerve pain? |
| A | Yeah, that was at—that was that psychotic. |
| Q | The Pamelor? |
| A | Yeah, Pamelor. |
| Q | Okay. Did you take that? |
| A | No. |
| Q | You didn't want to take it? |
| A | No, because I already knew what it was about, Pamelor. |
| Q | So did you –so you never once took it? |
| A | No. Pamelor and Cymbalta, they're all psychotic medications. No. |

Dkt. 102-2 at 15.

Dr. Talbot met with Mr. Perry on January 8. Dkt. 102-1 at 72–75. According to Dr. Talbot's treatment notes, he provided Mr. Perry with a home exercise plan to relieve his back pain and ordered x-rays of his back. *Id.* at 72. He also explained that it would take some time for Mr. Perry's

medications to relieve his back and foot pain. *Id.* Of course, Dr. Talbot was not aware that Mr. Perry was not taking the medications he had been prescribed.

Mr. Perry submitted another healthcare request on January 11 complaining of back pain. Dkt. 106-1 at 348. Dr. Talbot met with Mr. Perry the same day. Dkt. 102-1 at 68–71. It is not clear from the record whether this appointment occurred before or after Mr. Perry submitted his healthcare request.  During their visit, Mr. Perry again complained of foot and back pain, impaired vision, dry skin, and fluctuations in his blood-sugar levels. *Id.* at 68. According to his treatment notes, Dr. Talbot explained that it would take some time—likely more than a month—to find his optimal insulin dosage. *Id.* Dr. Talbot ordered lab tests, ordered that Mr. Perry return in two weeks, and prescribed Mobic for pain relief. *Id.* at 70. He also informed Mr. Perry that lotions would not be approved unless his skin became visibly cracked or sore. *Id.*

Mr. Perry submitted a healthcare request on January 15 stating that his Metformin was causing him to experience gas and increased neuropathy in his hands. Dkt. 106-1 at 350. It is unclear how Mr. Perry determined that these symptoms were side effects of the Metformin.

Dr. Tabot saw Mr. Perry for his two-week follow-up appointment on January 22. Dkt. 102-1 at 64. Mr. Perry reported that he was no longer experiencing episodes of low blood sugar. *Id.* Accordingly, Dr. Talbot did not adjust Mr. Perry's insulin dosage or discontinue the Metformin prescription. *Id.* at 64, 66. Mr. Perry reported that he had seen an optometrist. *Id.* at 64. Dr. Talbot advised Mr. Perry that he could avoid dry skin by drinking plenty of fluids, not using too much soap, and not staying in the shower too long. *Id.* Dr. Talbot did not adjust Mr. Perry's pain medications. *Id.* at 64–67.

Mr. Perry submitted a healthcare request regarding his back pain the very next day. Dkt. 106-1 at 351. Mr. Perry stated that Mobic was not relieving his pain and demanded to be

treated by a chiropractor. *Id.* Mr. Perry still did not reveal that he had not been taking Cymbalta or Pamelor as prescribed to treat his nerve pain.

On January 29, Mr. Perry submitted a healthcare request complaining of dry skin. *Id.*at 345. He stated that he could not afford to buy lotion from the commissary and had resorted to applying butter from his meals to his skin. *Id.*

On February 12, Dr. Talbot examined Mr. Perry during a chronic care visit. Dkt. 102-1 at 61–63. Dr. Talbot noted that Mr. Perry's blood sugar had regulated and that his chronic care appointments could be scheduled every three months (as opposed to every month) moving forward. *Id.* at 61. Mr. Perry complained again that his skin was dry and in need of lotion, but Dr. Talbot found that his skin was moist and oily and that no lotion was necessary. *Id.* He reiterated his advice to avoid overshowering and oversoaping and drink plenty of water. *Id.* Dr. Talbot did not alter Mr. Perry's pain medications. *Id.* at 61–63.

On February 20, Mr. Perry submitted a healthcare request seeking different medication for his back pain. Dkt. 106-1 at 299. He stated that it was dangerous to consume Pamelor and Cymbalta at the same time or with diabetes. *Id.* He added that the medication gave him "bad side effects." *Id.* Again, Mr. Perry did not divulge in this request that he was not actually taking either medication. On February 23, Mr. Perry submitted another healthcare request complaining that the nerve pain in his feet continued and specifically requested to be prescribed Tiagabine. *Id.* at 341.

Dr. Talbot met with Mr. Perry on February 26. Dkt.102-1 at 57–60. Dr. Talbot granted Mr. Perry's request to discontinue the Pamelor prescription. *Id.* at 57. However, he was under the mistaken belief that Mr. Perry was taking the Cymbalta prescribed by his psychiatrist and would receive some pain relief from that medication. *Id.* Dr. Talbot prescribed Tylenol and home exercises for additional pain relief. *Id.*

12

Dr. Talbot ordered x-rays of Mr. Perry's spine and hip on March 12. Dkt. 102-1 at 53-56. Also on March 12, Mr. Perry submitted a healthcare request for a stool softener, stating that his Cymbalta was causing him constipation. Dkt. 106-1 at 300. Of course, Cymbalta could not have been constipating Mr. Perry because he was not taking it.

Around this time, Mr. Perry became afflicted with a kidney infection and received Tramadol to relieve the pain in his kidneys. *See* dkt. 102-2 at 16–17. On March 19, Mr. Perry submitted a healthcare request requesting that he be prescribed Tramadol to treat his hip and back pain. Dkt. 106-1 at 245.

On March 26, Dr. Talbot visited with Mr. Perry. Dkt. 102-1 at 47–50. Dr. Talbot did not provide Tramadol, but he did prescribe Tylenol for pain relief. *Id.*

On June 14, 2019, Mr. Perry submitted a healthcare request stating that he was experiencing chest pain and that his stomach had been upset. Dkt. 106-1 at 358. Mr. Perry attributed these symptoms to Mobic. *Id.* Dr. Talbot met with Mr. Perry on July 3. Dkt. 102-1 at 42–46. At Mr. Perry's request, Dr. Talbot did not prescribe any more over-the-counter pain relievers. *Id.* Dr. Talbot ordered urinalysis and blood tests and reviewed ultrasound and x-ray images with Mr. Perry during this appointment. *Id.*

During the July 3 appointment, Mr. Perry revealed that he had surgery on his hip and neck in 1996 to repair a serious injury. *Id.* Based on this information and his examination, Dr. Talbot requested that Mr. Perry be examined by an outside neurologist and that he receive physical therapy inside the prison. *Id.* at 33–34. Mr. Perry met with a neurosurgeon on November 15. *Id.* at 77. The neurosurgeon determined that surgery would not be effective for Mr. Perry's injuries, but he may find relief from epidural injections. *Id.*

On November 19, Dr. Talbot met with Mr. Perry to discuss the recommendation that he be treated by an off-site pain specialist. *Id.* at 79–82. Dr. Talbot referred Mr. Perry to the on-site optometrist after Mr. Perry reported he was punched in the eye and experiencing impaired vision. *Id.* By this time, Mr. Perry's psychiatrist had discontinued Cymbalta, and Mr. Perry refused Dr. Talbot's offer to prescribe Cymbalta or Pamelor for his nerve pain. *Id.*

Dr. Talbot stopped working at PCF on November 30 and therefore ceased to be involved in Mr. Perry's care. Dkt. 102-1 at 8–9.

## B.   Analysis

Dr. Talbot met with Mr. Perry the day after he returned to PCF from the hospital in December 2018. Dr. Talbot continued as Mr. Perry's physician for the next eleven months, and he met with Mr. Perry a total of ten times in that span. The fact that Dr. Talbot visited Mr. Perry so regularly makes it difficult to conclude that he was indifferent to Mr. Perry's needs as a diabetic patient.

Nevertheless, an Eighth Amendment claim does not fail for the mere fact that the plaintiff received "*some* treatment." *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005). Courts must consider "the possibility that the treatment [the plaintiff] did receive was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Id.* (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). Accordingly, the Court considers the treatment Dr. Talbot provided for each of Mr. Perry's symptoms—impaired vision, fluctuating blood sugar, dry skin, and pain—and whether that treatment rose above the "blatantly inappropriate" standard.

14

### 1.   Impaired Vision

Dr. Talbot's treatment notes reflect that he referred Mr. Perry to an optometrist on December 20, 2018—within 24 hours of his return to PCF. Dkt. 102-1 at 18. Mr. Perry submitted a healthcare request four days later requesting to be examined by an eye doctor, and the response to that request indicated that an appointment was scheduled or requested the following day. Dkt. 106-1 at 338. And Mr. Perry saw an optometrist between the time he submitted that request and the time he met with Dr. Talbot on January 22. Dkt.  102-1 at 64. When Mr. Perry reported again on November 19 that he was having trouble seeing, Dr. Talbot referred him to an eye doctor the same day. *See id.* at 79–82.

Even outside of prison, patients who seek care from medical specialists must obtain referrals and wait for appointments. The evidence indicates that Dr. Talbot promptly referred Mr. Perry to the optometrist both times he reported visual impairments. No evidence supports an inference that Dr. Talbot delayed in making his referrals or that he could have done anything to provide Mr. Perry with better or quicker treatment for his visual impairments. A jury could not find Dr. Talbot deliberately indifferent to Mr. Perry's need for treatment by an optometrist.

### 2.   Fluctuating Blood Sugar

A similar analysis applies to Dr. Talbot's treatment of Mr. Perry's fluctuating blood-sugar levels. Dr. Talbot placed Mr. Perry on an insulin regimen and ordered a special diet on December 20, the day after he returned from the hospital. *Id.* at 18. Dr. Talbot adjusted Mr. Perry's insulin dosage on December 29. *Id.* at 14. On January 11, when Mr. Perry again complained that his blood sugar was not stable, Dr. Perry ordered lab tests and a follow-up appointment. *Id.* at 68–71. And, when they met again on January 22, Mr. Perry reported that his blood sugar was well regulated. *Id.* at 64. He did not complain about his blood sugar again while Dr. Talbot was his physician.

Dr. Talbot put Mr. Perry on insulin immediately after he returned from the hospital. In the next month, Dr. Talbot met with Mr. Perry four times, adjusted his insulin dosage, and achieved stable blood-sugar levels. No evidence in the record indicates that Dr. Talbot could have done anything to stabilize Mr. Perry's blood sugar faster—much less that the treatment he provided was blatantly inappropriate. *Greeno*, 414 F.3d at 654.

### 3.  Dry Skin

Dr. Talbot responded to Mr. Perry's complaints of dry skin only by advising him to drink plenty of fluids and avoid long showers and excessive soap. Even if different care was warranted, though, Dr. Talbot's treatment of Mr. Perry's dry skin could not support an Eighth Amendment claim.  Mr. Perry last complained of dry skin on February 12, 2019, less than two months after he returned from the hospital. Dkt. 102-1 at 61–63. "[T]he short-term absence of a cream that might alleviate dry and cracking skin does not present a plausible constitutional claim." *Conner v. Waterman*, 794 F. App'x 527, 529 (7th Cir. 2020). Any Eighth Amendment claim based on Dr. Talbot's treatment of Mr. Perry's dry skin is therefore "frivolous." *Id.*

### 4.  Pain

Mr. Perry began complaining of pain related to his diabetes on December 26, 2018. Dkt. 106-1 at 339. Dr. Talbot never succeeded in relieving Mr. Perry's pain. But this lawsuit concerns Dr. Talbot's efforts to treat Mr. Perry's pain—not the results of those efforts.

Initially, Dr. Talbot attempted to treat Mr. Perry's pain and neuropathy with medication. Three days after Mr. Perry complained he was experiencing pain, Dr. Talbot prescribed Pamelor. Dkt. 102-1 at 14–17. He based his Pamelor prescription on the facts that Mr. Perry already had an active prescription for Cymbalta and both are used to treat nerve pain. *Id.*

If this medication regimen was a total departure from medical standards for treating diabetic nerve pain, a jury could find Dr. Talbot deliberately indifferent. *Petties*, 836 F.3d at 729. But no evidence indicates that supplementing Mr. Perry's Cymbalta with Pamelor was a blatantly inappropriate treatment plan. Mr. Perry alleged as much in a healthcare request form, but he is not a physician, and he has not presented any evidence contradicting Dr. Talbot's statements that Cymbalta and Pamelor are used to treat nerve pain. *See* dkt. 102-1 at 5; Fed. R. Evid. 701.

For months, Dr. Talbot continued to treat Mr. Perry's complaints of pain with directions to take Cymbalta, Pamelor, and over-the-counter pain medications. For months, Mr. Perry nullified Dr. Talbot's treatment plan by not taking the medication and not telling Dr. Talbot that he was not taking the medication. "[W]hen a prisoner chooses not to receive treatment, including pain medicine prescribed by a doctor, the doctor is not deliberately indifferent." *Blankenship v. Birch*, 590 F. App'x 629, 633 (7th Cir. 2014).

Mr. Perry requested specific medications multiple times. But "an inmate is not entitled to demand specific care and is not entitled to the best care possible . . . ." *Arnett*, 658 F.3d at 754. Dr. Talbot did not violate Mr. Perry's constitutional rights by refusing to prescribe the medication of Mr. Perry's choice. The record indicates that Dr. Talbot offered Mr. Perry appropriate medication for his pain, but Mr. Perry refused to take it.

Six months after Mr. Perry began complaining of pain, he informed Dr. Talbot of his previous neck and hip injuries. Dkt.102-1 at 57–60. Dr. Talbot cannot be faulted for failing to treat injuries he did not know existed, and no evidence indicates that he should have been aware of Mr. Perry's previous injuries. Once he understood that Mr. Perry's pain may not be solely due to diabetes, Dr. Talbot implemented a new treatment plan. He requested that Mr. Perry be examined by an outside neurologist and that he receive physical therapy inside the prison. *Id.* at 33–34.

No evidence indicates that Dr. Talbot could have taken a more effective approach to Mr. Perry's pain and neuropathy—especially given Mr. Perry's refusal to cooperate with his efforts. Accordingly, no reasonable jury could return a verdict in Mr. Perry's favor.

## IV. Conclusion

Mr. Perry's motion for leave to file an amended designation of evidence, dkt. [111], is **granted**. The Court has considered Mr. Perry's additional submission.

For the reasons discussed in Parts II and III, Mr. Perry's motion for summary judgment, dkt. [104], is **denied**, and Dr. Talbot's motion for summary judgment, dkt. [100], is **granted**.

This action is **dismissed with prejudice**. The **clerk is directed** to enter **final judgment** consistent with this Entry and the screening Entry at dkt. 15.

**IT IS SO ORDERED.**

Date:   3/1/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

RODNEY S. PERRY, SR.
974441
PENDLETON – CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Angela Marie Rinehart
KATZ KORIN CUNNINGHAM, P.C.
arinehart@kkclegal.com